UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIK DANIEL RAMIREZ,<br><br>　　　　　　Petitioner,<br><br>　　v.<br><br>S. FRAUENHEIM, Warden,<br><br>　　　　　　Respondent. | No. 1:17-cv-00029-LJO-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

　　　　Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation serving a state prison sentence of 17 years. He has filed the instant habeas petition challenging his conviction. The Court finds that the state court rejections of his claims were not contrary to, or an unreasonable application of, Supreme Court precedent and recommends the petition be **DENIED.**

**I.　　PROCEDURAL HISTORY**

　　　　On July 26, 2013, Petitioner was convicted in the Kern County Superior Court of robbery, assault with force likely to produce great bodily injury, and participation in a criminal street gang, for which he was sentenced to a determinate prison term of 17 years. People v. Abelar, 2015 WL 8770170, at *1 (Cal. Ct. App. Dec. 14, 2015).

　　　　Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

DCA"). Id. On December 14, 2015, the Fifth DCA affirmed the judgment in a reasoned opinion. Id. Petitioner filed a petition for review in the California Supreme Court, and the petition was summarily denied on February 17, 2016. (LD[1] 16, 17.)

On January 9, 2017, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on April 25, 2017. (Doc. 20.) Petitioner filed a traverse to Respondent's answer on May 30, 2017. (Doc. 25.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[2]

> Pedro P., who was 17 years old at the time, was walking across a pedestrian bridge in McFarland around 8:00 or 9:00 p.m. on December 30, 2012. On the bridge, he encountered three males, one with a hood on his head and a scarf covering his face. He had seen the other two around town before. One of them asked Pedro for money and a phone. Pedro gave him $2 and handed him his phone. After a short time, Pedro prepared to walk away and asked for his phone back. It was not given back. The two whose faces had been uncovered donned black masks. One of the men kicked Pedro's legs out from under him, and the three proceeded to punch and kick Pedro as he lay on the ground. From his pants pocket they took his wallet, which contained some money. Then they ran away.
>
> Pedro ran off the bridge holding his chin, which had been hit, and soon encountered a police officer, who asked what was wrong. The officer took Pedro to the police station, where he told his story and was shown some photographic lineups. He selected photos of Abelar and Ramirez as depicting two of his attackers.
>
> The district attorney filed an information charging Abelar and Ramirez with four counts. Count 1 charged both defendants with second degree robbery. (§ 212.5, subd. (c).) In count 2, they were charged with making criminal threats. (§ 422.) Count 3 charged defendants with assault by means of force likely to cause great bodily injury. (§ 245, subd. (a)(4).) And count 4 charged them with being active participants in a criminal street gang. (§ 186.22, subd. (a).) Counts 1 through 3 included sentence-enhancement allegations that Abelar and Ramirez committed the crimes for the benefit of a criminal street gang. (§ 186.22, subd. (b).) Upon a defense motion during trial, judgment was entered for defendants on count 2.
>
> At trial, Pedro testified that, after he asked for his phone back, it was Ramirez who threw the first punch. Ramirez swung and missed. Then, as Ramirez was saying that Pedro should leave because Ramirez's friends were crazy, someone hit Pedro in the back and kicked his legs out from under him, causing him to fall. His glasses fell off. On the ground, he felt blows all over his body. He covered his face with his hands. Blows landed on his chin and cheeks. His head struck the ground. While one attacker was punching Pedro's face, another was kicking him. All three

---

[1] "LD" refers to the documents lodged by Respondent with his answer.
[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

attackers were striking Pedro, but he could not say which attackers delivered particular blows because he was covering his face. Finally, they took his wallet from his pants and left.

When Pedro ran away from the bridge and found a police officer, his chin hurt and he was holding it. At first, Pedro found he could not fully explain to the officer what had happened because he was in shock. The officer asked Pedro if he wanted to go to the hospital, but Pedro said no because he thought it would cost money. After being taken to the police station, he recovered his composure and told the story of the robbery.

Pedro testified that he did not hear his attackers say anything about gangs and did not see them make gang signs with their hands. Ramirez, however, was wearing a shirt Pedro considered to be gang clothing because he had often seen gang members wearing the same type of shirt.

McFarland Police Officer Brian Wilson testified that he and Officer Arturo Garcia encountered Pedro near the pedestrian bridge after the robbery. Pedro made an initial statement at the scene and was taken to the police station. Wilson did not observe any injuries or marks on Pedro, and Pedro did not ask for medical treatment.

Wilson testified that he showed Pedro two photographic lineups at the police station. Pedro selected pictures of Abelar and Ramirez and said they were two of the robbers.

Officer Garcia testified that he and Wilson interviewed Pedro at the police station within 30 to 45 minutes after first making contact with Pedro. The interview was recorded and portions of it were played for the jury. Pedro told the officers that, first, Ramirez punched him in the face with both hands. The third attacker then punched him in the chin. Next, Pedro dropped to the ground, and Abelar came up and kicked him on the leg. The third attacker kicked Pedro's other leg and then all three kicked him. Ramirez punched Pedro in the face again and made his head hit the ground. Pedro said, "[T]hat's when its like I can[']t I couldn't think no more." The three attackers continued punching Pedro. They were asking him his name and going through his pockets. He was afraid for his life and said they could take his money if they did not hurt him.

Ramirez and Abelar were interviewed by Sergeant Steven Nieves on January 3, 2013. The interviews were recorded and the recordings were played for the jury. At first, Ramirez denied knowing Abelar and said he was at home on the night of the robbery and knew nothing about a crime that happened on the pedestrian bridge. Later in the interview after a break, however, Ramirez admitted he was present at the robbery with Abelar and a person known as Mosco, whose real first and middle names were Moses Miguel. He said he beat up the victim, but he denied he ever had the phone or the wallet. He admitted he asked the victim for money and received $2 from him. Abelar took the phone from the victim and told Ramirez to hit him. Ramirez did not want to hit him, but when the victim said he would not give up his phone, Ramirez "got offended" and delivered a blow. Ramirez only hit the victim once. He bought himself a beer with the $2 on the way home.

Abelar told Nieves he was a member of the Myfas gang and had been since he was 10 years old. Abelar was wearing a belt buckle bearing the letter M, which he told Nieves stood for Myfas. He admitted he was walking with someone named Moses

3

Miguel on the pedestrian bridge on the night of December 30, 2012. Abelar did not admit he was involved in the robbery and did not mention Ramirez.

Nieves testified as the prosecution's expert on criminal street gangs. He said Myfas was the main gang in McFarland. While on duty, over the course of a number of years, he had talked with Myfas members often. The area around the pedestrian bridge where the robbery took place was part of the Myfas territory, and Nieves had often seen Myfas members on the bridge. He had often seen Myfas graffiti there, and fresh Myfas graffiti appeared there frequently.

Nieves explained that one of the two main groups of Hispanic street gangs in California is the Sureño (southern) group, and this group is affiliated with and receives orders from the prison gang known as the Mexican Mafia. Sureño gangs associate themselves with the letter M (for Mexican Mafia), which is the 13th letter of the alphabet, and also with the number 13. They wear blue and make distinctive hand signs. Nieves testified about a photograph showing some graffiti on a wall in McFarland. He pointed out the word "sur" (south); a pattern of three blue dots representing the number 13; an X (the Roman numeral 10) and a three together, to make 13; "ST" for sur trece (south 13); "MYFA"; and "VMST" for "Varrio Myfas Sur Trece" (neighborhood Myfas south 13). "Baby Boy," the moniker of a Myfas member, also appeared as part of the graffiti, as well as "187," the Penal Code section defining murder. Nieves also testified about a photograph showing similar graffiti on the pedestrian bridge where the robbery took place.

Nieves said there were around 50 to 65 Myfas members, some in prison and some out. He named several individual Myfas members of whom he was aware. He opined that the primary activities of Myfas included vandalism, robbery, criminal threats, assault, home invasions, vehicle thefts, burglaries, shootings, shooting at inhabited dwellings, illegal firearm possession, and murder.

Based on court records, Nieves testified about several offenses committed by Myfas members in McFarland. He described an incident involving two Myfas members resulting in convictions of evading police officers, assault with a deadly weapon, being a felon in possession of a firearm, and possessing a prohibited weapon. Nieves described another case in which a Myfas member was convicted of shooting at an inhabited dwelling (§ 246) and being an active member of a criminal street gang (§ 186.22). Finally, he described a prior offense committed by Ramirez, an incident of gang graffiti writing that resulted in a conviction of vandalism (§ 594).

Nieves opined that Abelar and Ramirez were Myfas members at the time of the robbery. This opinion was based on numerous sources of information, including Nieves's own reports, jail booking records, and field identification cards. Nieves also relied on Abelar's admission of gang membership during his interview following the current offenses and his belt buckle bearing an M. Abelar said he was a Myfas member when, during his booking at the county jail on the current offenses, he was asked about his affiliation for housing purposes. Abelar's first and last names, along with his moniker and Myfas affiliation, were found on a handwritten document titled "Sure[ñ]o ro[ll] call" found in the cell of a Sureño leader in the county jail. Ramirez also admitted he was a Myfas member in his interview with Nieves after his arrest for the vandalism offense. Ramirez said he was a Sureño during his booking on the current offense and said he was a Myfas member during his booking for a prior offense. Nieves reviewed a field identification card documenting another officer's contact with Ramirez. The card indicated that in 2012, Ramirez was seen in the company of another Myfas

4

member.

Nieves observed gang tattoos on both defendants. He contacted the third suspect in the current offenses, a juvenile identified by Abelar and Ramirez as Mosco; Mosco had a blue handkerchief and two blue hats emblazoned with the letters "KC," a legend used by Kern County gang members to identify themselves. The current offenses were committed in a place frequented by Myfas members.

The prosecutor presented Nieves with hypothetical crimes based on the details of this case. Nieves opined that such crimes would be for the benefit of, at the direction of, or in association with a criminal street gang.

Abelar, 2015 WL 8770170, at *1–4.

### III. DISCUSSION

A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

5

Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's

ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C. Review of Petition

The instant petition presents the following grounds for relief: 1) The evidence was insufficient to find Petitioner committed assault by force likely to produce great bodily injury; 2) The trial court violated Section 654 by imposing consecutive terms on the robbery and assault counts despite evidence that the assault was for the single objective of carrying out the robbery, and 3) The trial court erred in imposing a ten-year term pursuant to Section 186.22(b)(1)(C) when the jury found true the five-year term enhancement pursuant to Section 186.22(b)(1)(B).

1. Insufficiency of the Evidence

In his first claim, Petitioner alleges the evidence was insufficient to support the finding that the force used during the assault was likely to cause great bodily injury. He admits the evidence showed he hit the victim; however, he contends his actions of pushing or striking at the victim could not constitute force "likely" to produce great bodily injury. (Doc. 1 at 26.)

a. State Court Decision

Petitioner presented this claim in his state appeal. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> Ramirez argues the evidence was not sufficient to prove the assault he committed involved means likely to cause great bodily injury. Abelar joins in the argument.
>
> When considering a challenge to the sufficiency of the evidence to support a judgment, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible, and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

7

> To prove an assault by means likely to cause great bodily injury within the meaning of section 245, subdivision (a)(4), the prosecution did not have to show any actual injury. It had to prove only that the means used were likely to cause great bodily injury. (*People v. Wingo* (1975) 14 Cal.3d 169, 176; *People v. Parrish* (1985) 170 Cal.App.3d 336, 343.) Punching and kicking can constitute means likely to produce great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028; *Wingo, supra*, at p. 176.) Evidence regarding the force of the blows and the manner and circumstances of their application is probative of whether they were likely to cause great bodily injury. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.)
>
> Ramirez argues the evidence was insufficient because there was "no testimony about how hard [Pedro] was hit in the head, or how many times [he] was hit in the head," and because the police observed no injuries and Pedro did not ask for medical treatment. We do not agree.
>
> Pedro testified one of his attackers kicked his legs out from under him and he fell. Then all three punched and kicked him as he lay on the ground, including blows to his chin and cheeks. When Ramirez punched him, his head hit the pavement. When he first spoke to a police officer shortly afterward, his chin hurt, he felt he was in shock, and he could not coherently explain what happened. After Pedro's head hit the ground, he "couldn't think." He feared for his life and was in pain. He did not ask police officers to get medical treatment for him, and he did not appear to them to need it. He testified he declined to go to the hospital because he feared the cost.
>
> From this evidence, the jury could reasonably infer that Pedro's attackers stunned him by knocking him down and then punching his head and causing it to strike the ground. From this, in turn, the jury could infer the force used was likely to cause great bodily injury. Neither defendant suggests any difficulty arises from the fact that, for the most part, Pedro did not know which attacker was responsible for which blows. Consequently, we reject defendants' argument that the evidence was insufficient to prove count 3.

Abelar, 2015 WL 8770170, at *8.

b. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

8

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

    c. Analysis

In this case, the state court determination that sufficient evidence supported the finding that Petitioner used force likely to cause great bodily was reasonable. As noted by the court, the evidence did not just consist of Petitioner pushing or striking at the victim. Rather, the evidence showed that the victim was taken to the ground, and after he hit the ground, Petitioner struck him in the head causing the victim's head to strike the pavement. As a result, the victim was stunned, incoherent, and in great pain. From this evidence, a rational factfinder could determine that Petitioner used force likely to cause great bodily injury. Accordingly, Petitioner fails to

demonstrate that the state court rejection of his claim was an unreasonable application of Supreme Court authority. The claim should be denied.

### 2. Instructional Error – Grounds Two and Three

In Ground Two, Petitioner alleges the trial court erred by imposing consecutive terms for the robbery and assault counts. He claims the court should have stayed the assault count pursuant to Section 654 because the assault was part of the robbery. In Ground Three, Petitioner claims the trial court erred in imposing a ten year sentence instead of a five year sentence.

As to both grounds, Respondent correctly argues that Petitioner fails to state a cognizable federal claim. It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings).

Petitioner challenges the state court's application of state sentencing laws. Such a claim does not give rise to a federal question cognizable on federal habeas review. Lewis v. Jeffers, 497 U.S. 764 (1990); Sturm v. California Youth Authority, 395 F.2d 446, 448 (9th Cir. 1967) ("a state court's interpretation of its [sentencing] statute does not raise a federal question"). The Fifth DCA determined that the trial court sentenced the petitioner properly under state law. State courts "are the ultimate expositors of state law," and federal courts are bound by their constructions except in "extreme circumstances," such as where a state court's interpretation of state law appears to be an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 (1975). There is no indication of "obvious subterfuge" here. The claim should be denied.

## V. RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

10

1 Local Rules of Practice for the United States District Court, Eastern District of California.  Within
2 twenty-one days after being served with a copy of this Findings and Recommendation, any party
3 may file written objections with the Court and serve a copy on all parties.  Such a document
4 should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies
5 to the Objections shall be served and filed within ten court days after service of the Objections.
6 The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).
7 The parties are advised that failure to file objections within the specified time may waive the right
8 to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **August 31, 2017**          /s/ Jennifer L. Thurston
                                     UNITED STATES MAGISTRATE JUDGE